JOHN YOUNG *vs.* MESHACK FROST, ISAIAH FROST, AND OTHERS.—*December*, 1847.

*F., Senior*, devised separate and distinct portions of his land to each of his three sons, *J.*, *M.* and *F.*, *Junior;* and to his two sons, *J.* and *M.*, an equal interest in the coal mine and saw mill on the part devised to *F.*, *Junior*, as he took under his father's will. That estate he orally contracted to sell to *N.* In this state of things, *J.*, *M.* and *N.* agreed with each other, that they and their heirs and assigns should thereafter have and enjoy free and equal intercourse to each

one undivided third part of all the coal in and on all our land; that is to say, *F.'s, Junior,* part now sold to *N.* *J.* agreed to let *M.* and *N.* have free intercourse to the *coal mines* on his property left him by his father, and to let *M.* and *N.* have the privileges of coal on his land, building a house at the mouth of the pit for the conveniency of coal diggers. *M.* gave to *J.* and *N.* the same privileges; and *N.* gave to *J.* and *M.* the same privileges, and "to share alike and alike." This agreement, which was under seal, further declared, that *J.* and *M.* doth agree to give to *F., Junior,* and his heirs, the privilege of the interest of their two shares of coal, all that he will haul with his own teams, or his heirs, by digging coals for himself, or themselves, for which the said *F., Junior,* doth agree to keep the banks in complete order, so as not to injure them by digging, to destroy the banks. Shortly after this, *F., Junior,* conveyed his interest by deed to *N.* *Held,*

1. That the clause in the agreement,—" that is to say, *F.'s, Junior,* part now sold to *N.*," was not an exposition of the whole instrument, and did not restrict and confine the whole contract to the land sold by *F., Junior,* to *N.,* for neither *J.* nor *M.* could confer upon *N.* any benefit in his own land and coal.

2. That clause was intended to show, and shows, out of what land and coal *N.* designed to secure a benefit to *J.* and *M.,* and obliges him to allow them the privileges they claimed under their father's will.

3. The parties had declared that all three and their heirs should have and enjoy free and equal intercourse to each one undivided third part of all the coal in and on all our land, and the subsequent terms, " that is to say, &c.," qualify those general expressions, and point out what land, as respects *N.'s* obligation, they were intended to include.

4. This agreement so far contains the essentials of a contract, and the intention of the parties is so manifest on its face, that a court of equity may decree its specific execution.

Courts of justice, as far as practicable, will avoid such constructions of agreements, as may render them void; and endeavor to give an operative and binding meaning and intention to the stipulations of the contracting parties.

Upon a contract under seal, containing mutual stipulations, a court does not affect to weigh the actual value, nor insist upon the equivalent in contracts, where each party has equal competency.

Improvidence or inadequacy of consideration, do not determine a court of equity against decreeing specific performance. When undue advantage is taken, it will not enforce that.

Parol evidence is not admissible to prove the intention of a contract under seal; but it is admissible to prove fraud, or omission by mistake only.

APPEAL from the equity side of *Alleghany* County Court.

The bill in this cause was filed on the 17th February, 1845, by *John Young,* and alleged that on the 22d August, 1843, he purchased of a certain *John Neff,* at and for the consideration of $7,000, cash payment, all those parts or parcels of the

real estate of the late *Josiah Frost*, and all other interests in said real estate which were devised by the said deceased to his son, *Josiah Frost, Junior*, and which were conveyed by the said *Frost, Junior*, to the said *John Neff*, by deed bearing date the 1st December, 1828, and duly recorded, excepting that portion thereof which was sold by the said *John Neff* to *J. L. Skinner*, and which is mentioned and described in the deed from the said *John Neff* and others, to *Charles Williams* and *Orlando Harryman* of the city of *New York*, bearing date, &c., and duly recorded; and that your orator also purchased of the said *John Neff* all the interest, rights and privileges which were acquired and secured to the said *John Neff*, under and by virtue of certain articles of agreement, made and entered into between him, the said *J. N.*, and *Isaiah* and *Meshack Frost*, bearing date on the 27th October, 1828.

And your orator further sheweth, that by the last will and testament in which the said *Josiah Frost*, deceased, devised the lands and interests as aforesaid to the said *Josiah Frost, Junior*, he also devised certain lands and interests to his other two sons, namely, the said *Isaiah Frost* and *Meshack Frost*. That the devise to the said *Josiah Frost, Junior*, was all that parcel of land lying and being in said *Alleghany* county, and distinguished as follows, to wit: Beginning at the beginning of lot No. 3639, &c.

Also the whole tract of land called "*This or None*."

That the devise to the said *Isaiah Frost* was of all that parcel of land lying and being in said county, and distinguished as follows, to wit: Beginning at the end of three perches on a line drawn North, sixty-two degrees West from a bounded white oak, standing on the North side of the turnpike road, &c.

That the devise to the said *Meshack Frost* was of the following parcels of land lying and being in said *Alleghany* county, to wit: Beginning for the first parcel at the end of three perches on a line drawn North, sixty-two degrees West from a bounded white oak, standing on the North side of the turnpike road, and running, &c.

And beginning for the second parcel at the same beginning,

37    v.5

and running North seventy-four degree and a half, East thirty-one perches, to the end of thirty perches on the first line of lot No. 4088, and with it reversed North ten degrees, West ten perches to a stake, &c.

And your orator further sheweth, that in connexion with the devise made as aforesaid to the said *Josiah Frost, Junior,* the testator excepted and reserved for the benefit of his other two sons, *Isaiah Frost* and *Meshack Frost,* in the words following, to wit: "*Nevertheless, the saw mill and coal mine situate and being on this, my son Josiah's part, it is my will and pleasure, and I do hereby ordain that my two sons, to wit, Isaiah and Meshack, shall have shares alike in the said saw mill and coal mine with my said son Josiah, that is to say, each one-third to them and their heirs and assigns forever.*"

And your orator further sheweth, that he also herewith exhibits a true copy of the aforesaid articles of agreement mentioned and referred to in exhibit A., which were made and entered into between the said *John Neff, Isaiah Frost* and *Meshack* on the 27th October, 1828, which said copy is in the handwriting of the late *Benjamin G. Vaughn,* deceased, with whom the original articles were deposited, to be kept by consent of the parties. That by the said articles it is agreed between *Isaiah Frost, Meshack Frost* and *John Neff,* heirs and representatives of *Josiah Frost,* deceased, in the words following, to wit: "that they and their heirs and assigns shall hereafter have and enjoy free and equal intercourse, that is to say, to each one undivided third part of all the coal in and on all of our land, that is to say, *Josiah Frost's* part now sold to *John Neff,* and the said *Isaiah Frost* doth agree to let *John Neff* and *Meshack Frost* have free intercourse to the coal mines on his property left to him by his father; and he further agrees to let *Meshack Frost* and *John Neff* have the privileges of coals on his lands, and the privilege of building a house at the mouth of the pit, such a house as suits themselves for the conveniency of coal diggers; and also the said *Meshack Frost* doth give to *Isaiah Frost* the same privileges as above; and also the said *Neff* doth agree to give unto *Isaiah Frost* and *Meshack Frost*

the same privilege as above, in coals, building houses and making repairs, and to share alike and alike; and the said *Isaiah* and *Meshack* do agree to give unto *Josiah*," &c. &c., which said articles of agreement are sealed as well as signed by the said *John Neff*, *Isaiah* and *Meshack.* That it thus appears from the explicit language of the said articles of agreement, that the said *John Neff*, *Meshack* and *Isaiah* mutually covenanted, each with the other, that they should severally have one undivided third part of all the coal " in and on " all the land which had been devised as aforesaid by the last will and testament of *Josiah*, deceased, to his said three sons, *Meshack*, *Isaiah* and *Josiah, Junior*, to which said *Josiah's, Junior*, part, the said *Neff* had succeeded by purchase as aforesaid. That at the time these articles were entered into, there was opened and in use upon that part of said estate which was devised to the said *Josiah, Junior*, certain coal shafts or pits denominated "coal mine" in said last will and testament. That the testator devised to the said *Meshack* and *Isaiah Frost*, equal shares in this "coal mine" with the said *Josiah Frost*, on whose portion of the devised estate, the shafts or pits opened as aforesaid; and that in order that the said *John Neff*, *Meshack Frost* and *Isaiah Frost*, might be invested with equal shares in all the coal appertaining to the lands respectively devised as aforesaid by the said testator to his three sons, they mutually covenanted for such equal shares by the aforesaid articles of agreement. And your orator further sheweth, that having become entitled by the purchase and deed from *Neff* as aforesaid, to one undivided third part of all said coal, as well as to the sole right and possession of the surface and soil of that part of said estate devised as aforesaid to *Josiah Frost, Junior*, excepting so much thereof as was conveyed as aforesaid to *Williams* and *Harryman*, as well as the coal in such parcel, *he was anxious to have his interest in said coal divided and set apart from the interest of the said Meshack and Isaiah Frost respectively. That such a division as will give to each of the parties his portion and share in severalty, of one undivided third part of said coal is practicable.* That the quantity of coal con-

tained in said devised land, is easily estimated, and that a division thereof can be made by surface measurement and delineation. And in order to have such a division effected by private arrangement between the parties, your orator has repeatedly solicited the said *Meshack* and *Isaiah* to unite with your orator and either proceed to make a division amongst themselves, or to elect some competent third person or persons skilled in engineering, and having a thorough knowledge of the subject, to make such division. And your orator further sheweth, that he had hoped and believed, that he could have in the meantime effected some satisfactory arrangement with the said *M.* and *I.*, in regard to the working of the "coal mine" already opened and in use as aforesaid upon the *Josiah Frost* part of said devised estate. That for the last several years, or at least for some time past, a certain *George Layman* has been in possession of said coal mine, using and working the same by virtue of some lease or authority given to him by the said *M.* and *I.*, and that no account has been kept or rendered of the quantity of the coal mined and taken away by the said *Layman*, and that no account is now being kept or rendered, and that your orator is entirely without any data whereby such quantity can be ascertained. And your orator has been informed and believes, that the mining operations of the said *George Layman* are carried on without any sort of skill or ability, and that they tend to the ruin and destruction of the mine; that for the sake of securing *present* advantages and facilities in getting out coal, the said *Layman* is removing the pillars which have been heretofore left as the props and supports of said mine. That these pillars are indispensable to the safety and security of the miners. That although a few of them, if left standing, may answer the purpose for a short while—for a year or so whilst the tenant remains—yet that without a goodly number thereof judiciously arranged and distributed through the mine in its various chambers, it becomes dangerous in time to carry on coal excavations in said mine; and that owing to this sense of danger, which spreads itself amongst the miners, the proprietor is unable to employ them; and hence, the mine itself ultimately

becomes useless and valueless; and if the proprietor wishes to make any further use of his coal beds or veins, he is driven to the necessity of making new openings and sinking new shafts. For these and various other reasons, your orator was anxious to effect an amicable arrangement between himself and the said *Frosts*, in regard to the interest which they held in common in said coal; and your orator had well hoped and believed, that he could have effected by private arrangement an amicable division of their interests. But your orator has wholly failed in his just and reasonable expectations heretofore entertained in this behalf. The said *Meshack Frost* and *Isaiah Frost* not only refuse to make an amicable division with your orator or the coal interest held in common by them as aforesaid, but they refuse to make any terms or come to any arrangement whatever with your orator. They deny that your orator is entitled under said articles as the grantee of *Neff*, to an undivided third or any other part whatsoever of the coal " in and on" those parts of the estate of *Josiah Frost*, deceased, which were devised to the said *Meshack* and *Isaiah* as aforesaid. They deny that your orator has any right or authority to call them to an account or settlement for the coal that is being taken and carried away from the aforesaid "coal mine." And your orator further sheweth, that the said *M.* and *I.* are proceeding in defiance of your orator's remonstrances, and against the interests and in open violation of the rights of your orator, to dig and open new coal shafts and pits upon said devised lands; that they pretended to have located such new shafts or pits upon those parts of said lands respectively devised to the said *M.* and *I.;* but they are wantonly and notoriously cutting roads leading to and from said new shafts or pits, in, upon and over *Josiah Frost's, Junior*, part of said devised lands, and especially that portion of such part of which the surface or soil is exclusively owned by your orator, as the grantee of *Neff*. Your orator is persuaded and believes that the said *Meshack* and *Isaiah Frost* have not sufficient business capacity and habits to qualify them to carry on mining operations with any sort of success. And that unless your orator can be left

to his own separate management in regard to his share of said coal interests, he had better relinquish his rights altogether. That a gratuitous surrender of them would be preferable in his opinion, to a participation with the said *Meshack Frost* and *Isaiah Frost,* in any of their schemes or plans for the mining of coal. That judging of these men as they are, and also judging of them by their past operations, there would be every reason to fear that instead of making profits by the business, they will only add to their debts thereby, &c. And that it will be destructive and ruinous to the interests of your orator, if the said *Meshack* and *Isaiah* are suffered and permitted to go on, opening, as they are now doing at their discretion, new shafts and pits upon said devised lands, at such points as they may think fit to designate, and to cut and make roads to such shafts and pits, over the land of your orator, just as they may choose, not only without the consent of your orator, but without consultation with him, and against his express wishes and remonstrances. *Prayer* for a discovery—account of coals mined and sold—profits and emoluments—specific execution of the articles of agreement of 27th October, 1828—mutual execution of deeds—division and separation of all the coal owned in common—each to be allotted his part in severalty, and this either by surface measurement or by separate alternate enjoyments of the whole for certain limited periods—for an intermediate injunction—subpœna, and general relief.

With their bill the complainants exhibited,

1. A deed from *John Neff* to *John Young,* of the 22d August, 1843, all the estate devised by *J. F., Sr.,* to *J. F., Jr.* and conveyed by the latter to *John Neff,* on the 1st December, 1828, and all the estate and interest granted to *J. N.* under the articles of agreement of the 27th October, 1828.

2. The last will of *Josiah Frost, Senior,* of 30th March, 1813.

3. Extract of deed from *Josiah Frost* to *John Neff.*

4. Deed 30th September, 1835, *John Neff, Isaiah* and *M. Frost,* to *Charles Williams* and *Orlando Harryman.*

5. Exhibit E. The agreement of 27th October, 1828, be-

tween *Isaiah* and *Meshack Frost* and *John Neff*, attested by *B. G. Vaughn*, a copy of which will be found in the opinion of this court.

The answer of *Meshack* and *Isaiah Frost*, admitted that *Josiah Frost, Senior*, did by his last will and testament devise to his three sons, namely, these defendants, and *Josiah Frost, Junior*, the several portions of his real estate, which are particularly described in the said bill of complaint. And these defendants further admit, that the said *J. F., Jr.*, did sell and convey to the said *John Neff*, the real estate so devised to him by the will of his said father, as appears, &c. And they also admit that certain articles of agreement were executed between *Isaiah Frost, Meshack Frost* and *John Neff*, in and about the month of October, in the year 1828, but these defendants deny that the paper exhibited by the complainant, marked "E," is an exact copy of the said agreement, and they therefore call upon the complainant to produce the original agreement. They, however, totally and positively deny that the said agreement had reference to all the lands which had been so devised by the said *J. F.*, deceased, to his three sons *I., M.* and *J.* On the contrary thereof, these defendants aver, that said articles of agreement referred exclusively and alone to the land so devised to the said *Josiah Frost, Junior*, in the coal, upon which part the said brothers had, by the will of their said father, a joint interest, whilst neither the said *J. F., Jr.*, nor the said *J. N.*, his grantee, had any interest under said will, in either the coal or the lands of either of the said *Meshack* or *Isaiah*.

These defendants further answering say, that at the time of the execution of the will of the said *J. F., Senior*, neither the extent nor the value of the coal deposits of *Alleghany* county were known or appreciated. There was but one mine opened or used on the estate of the said testator, and *that* was the portion of his estate which he devised to his son *Josiah*. In this coal mine, there being no other at the time opened or in use upon his estate, the testator gave to his three sons shares alike, that is to say, each one-third to them and their heirs and

assigns forever. And these defendants are advised and so insist, that by the terms of the said devise they are vested with an estate of inheritance in all the coal in and upon the portion of his estate so given by the testator to his son *Josiah.* That up to, and for a considerable period after the execution of the agreement of October, 1828, that is to say, up to the year 1844, the said coal mine remained the only coal mine on the whole estate so devised by the said testator, except part of an opening made by *George Waddle* some time about the year 1833 or 1834, and which was supposed by him to be made upon his own land, but was afterwards ascertained to be in part upon the said *W.'s* land, and in part upon the said land so devised to the said *J. F., Jr.* That the said agreement had respect only to the coal mine, so as aforesaid open in the year 1828, at the time the said articles of agreement were executed, belonging equally to the parties, and the same was intended to settle and adjust among themselves, in a manner most convenient to the parties, rights which they already possessed, and not to create any new rights not existing in the said *John Neff* prior to the said agreement. That no consideration passed from the said *John Neff* to these defendants, or either of them, nor did any other reason or inducement exist why they should grant to said *Neff* a right to enter upon their soil and dig for coal, without restriction as to time, place or quantity. These defendants further state, that in or about the last of October, 1828, the said *J. F., Jr.* and *J. N.* were in treaty for the lands of the said *Josiah,* when these defendants understanding that the said *J. F., Jr.* and *J. N.* had gone up to *Benjamin C. Vaughn's,* the defendants followed them up to the said *Vaughn's,* and there informed the said *J. N.* that these defendants owned each one-third of the coal in the lands which the said *J. F.* was about to sell to him, and that the said *J. F.* had promised to let these defendants have three acres of land at the mouth of the coal pit, or at the mouth of any other opening which these defendants might choose to make, and that the said *J. F., Jr.* had promised to allow these defendants to make other and different openings from the opening then on the land, and which was

the only coal opening or coal pit on the said lands devised by the said *J. F., Senior*, by the will aforesaid. The said *J. N.* replied that these defendants had come up for the purpose of interfering or undermining him, the said *J. N.*, in his contract with the said *J. F.* These defendants replied that the said *N.*, after he purchased, might sell to some one who would give these defendants trouble in working their coal, and that the land was as much the land of these defendants, as it was the land of the said *J. F., Jr.*, but that if *Mr. Neff* did not choose to carry out the undertaking which these defendants had with the said *Josiah Frost*, that these defendants could and would purchase the interest of the said *J. F., Jr.* Whereupon, the said *J. N.* agreed, *that if he purchased* from the said *Josiah*, who was present at the whole of this interview, he would give these defendants the privilege of building at the mouth of the coal mine, for miners or coal diggers, and the privilege of taking out coal at any other opening which they might choose to make. These defendants insisted on the agreement being put in writing, when *Benjamin G. Vaughn* was requested to draw the writings, and to carry out this understanding was the only object of the said agreement drawn by *Vaughn*. It was so done, and a few days thereafter the said *J. F., Jr.* sold and conveyed his interest in the land to the said *John Neff*.

And these defendants insist, that even by the copy of the articles of agreement filed by the complainant, it is expressly confined to *J. F.'s Jr.* part of the land devised to him by his father, or "*Josiah Frost's* part now sold to *John Neff*." And these defendants aver, that if they had understood the agreement as extending to the lands which these defendants held under the will of their father, they never would have signed or executed it. That there was no consideration passed between the parties for any such a contract. And these defendants aver that *John Neff* never pretended that the said agreement gave him any such rights or privileges, or any interest whatsoever in the lands which were devised to these defendants by their father, until about seven years after said agreement had been entered into. Nor do these defendants believe that the

38　v.5

said *John Neff* would even then have set up any such an un-
founded claim, if it had not been that he had sold a large por-
tion of these lands so purchased from *Josiah Frost, Junior,* to
*Charles Williams* and *Orlando Harryman,* and promised to
make them a title in fee for the same, which he was unable to
do, because these defendants held each one-third of the coal
in said land by the will of their father. And these defendants
refused to sell said interest, or join the said *John Neff* in said
conveyance, unless these defendants received a certain portion
of the purchase money. Then for the first time, these defen-
dants heard of the claim of the said *John Neff,* as now set up
in the complainant's said bill of complaint. These defendants
then, as now, positively denied the right of the said *John Neff*
to any interest in the coal in the lands of these defendants, as
devised to them by the will of their father, and they now
charge that the complainant knew at the time he purchased,
that these defendants denied any such right in the said *Neff,*
and that the complainant was purchasing a law suit. These
defendants admit that the complainant and these defendants are
tenants in common in the coal in that part of the land which
the complainant purchased of the said *John Neff,* as part of
the land conveyed to him by the said *Josiah Frost, Junior,* and
which these defendants believe amounts to about fourteen or
eighteen acres. To a division of the coal in this piece of land
by surface measurement, as said complainant proposes, these
defendants have not only no objection, but are anxious for said
division, because these defendants have about the same opinion
of the complainant's sense, that the complainant charges in his
bill, he has of the skill of these defendants to manage their
own business. These defendants aver, that previous to the
sale by the said *John Neff* of his interest in and to the land
sold to the said complainant, the said *John Neff* had taken a
large quantity of coal out of said coal mine, to wit, from four
to six hundred thousand bushels, with the understanding and
agreement, that these defendants should take an equal quantity
each, whenever they desired to do so, and these defendants
aver that neither of them have yet taken out any thing like the

amount which the said *Neff* took out previous to his sale to the complainant. And these defendants claim to take out as much coal as will make them equal with the said *John Neff* in that respect. These defendants admit that they placed the said *George Layman* in said coal mine, and authorized him to take coal therefrom, as they had a right to do under their agreement with the said *J. N.* These defendants also admit, that the said *Layman* has not kept an exact account of the number of bushels taken out by him, because the said *John Neff* kept no accurate account whilst he was taking out coal, and the said *Layman* has not taken out one-third of the coal which said *Neff* took out under the agreement before he sold to the complainant. But these defendants deny that the said *Layman* has been carrying on the mining of coal in said mine without skill, or that he is working the mine in such a way as to destroy the mine, as alleged in said complainant's bill. These defendants also deny that it is true, "that for the sake of securing present advantages and facilities in getting out coal, the said *Layman* is removing the pillars which have been heretofore left as the props and supports of said mine," as is alleged in said bill. On the contrary, these defendants aver, that neither the said *George Layman*, nor any other person in the employ of these defendants, or either of them, ever did remove any of the said pillars, or do any other injury to the said coal mine as alleged in said bill, but these defendants charge that the said *J. N.* and persons under his employ, did remove several of the said pillars in the said mine, before complainant purchased, against which these respondents remonstrated with the said *J. N.* at the time, and actually threatened to file a bill of injunction against said *Neff*, to prevent him from thus removing the said pillars, when, after consulting a lawyer on the subject, he, the said *John Neff*, promised to cease removing any more of the said pillars.

A commission was issued to take proof, and it appeared that the agreement of October, 1828, had been drawn by *B. G. Vaughn*, and left with him by the parties; that he had said he had sent it to *Wright* by request of *Mr. Frost.* *Wright* proved

that he had never received it.   Notice was given to the defen-
dants to produce it, and it was admitted that diligent search
had been made for the agreement among *Vaughn's* papers, who
was dead, and that the original could not be found.   The copy
was proved by *Josiah Frost*, present at its execution, and by
*George McCulloch*, who had seen the original in the hands of
*Vaughn*, and knew the signatures of the parties.

   After many exceptions to the proof as taken, the cause was
submitted to *Alleghany* county court, (MARTIN J.) who, on
the 9th October, 1846, pronounced the following opinion and
decree:

   In the examination of this case, several questions of interest
were raised by the counsel and discussed with ability; but the
construction which I have placed on the agreement of the 27th
October, 1828, renders it unnecessary to express an opinion of
those points.

   I am satisfied from an examination of the evidence, that the
paper referred to in the testimony of *George McCulloch*, and
designated as number 4, is the true copy of the original agree-
ment mentioned in the proceedings.   And as it corresponds
with the agreement described in the bill, I can perceive no
reason for any just exception to the pleadings; either on the
ground of variance between the contract charged, and that
which was proved, or because the contract is not set out with
sufficient distinctness and precision.

   It is certainly an undoubted proposition, that the contract
charged in the bill must accord with that which is verified by
the evidence, but when that is accomplished, I am aware of no
principle of law which could deprive a complainant of the
specific execution of a contract, unexceptionable in other
respects, because he was mistaken in the accuracy of a paper
referred to, as a supposed copy of a lost agreement.   If there
had been created any real doubt as to whether the paper
referred to as exhibit E., or the paper numbered 4, was the
representative of the original agreement, the case would have
presented a different aspect, as there is a marked discrep-
ancy between them, and the court could not have pronounced

which was to be enforced. But this difficulty is removed by the evidence, and the objection is indeed at once silenced by the answer of the defendants, in which they admit that the paper E. is not an exact copy of the agreement.

The agreement is in these words:

"Articles of agreement made and agreed on this 27th day of October, 1828, between *Isaiah Frost, Meshack Frost* and *John Neff,* heirs and representatives of *Josiah Frost,* deceased, have and do hereby fairly agree to and with each other, that they and their heirs and assigns shall hereafter have and enjoy free and equal intercourse: that is to say, to each one undivided third part of all the coal in and on all our lands, that is to say, *Josiah Frost's* part now sold to *John Neff.* And the said *Isaiah Frost* doth agree to let *John Neff* and *Meshack Frost* have free intercourse to the coal mines on his property left him by his father, and he further agrees to let *Meshack Frost* and *John Neff* have the privileges of coals on his land, and the privileges of building a house at the mouth of the pit, such a house as suits themselves for the conveniency of coal diggers; and also, the said *Meshack Frost* doth agree to give to *Isaiah Frost* and *John Neff* the same privilege as above; and also, the said *John Neff* doth agree to give unto *Isaiah Frost* and *Meshack Frost* the same privileges as above in coals, building houses, and making repairs, and to share alike and alike. And the said *Isaiah Frost* and *Meshack Frost* doth agree to give unto *Josiah Frost* and his heirs, the privilege of the interest of their two shares of coal, all that he will haul with his own teams or his heirs, by digging the coals for himself or themselves, for which the said *Josiah Frost* doth agree to keep the banks in complete order, so as not to injure them by digging to destroy the banks," &c.

It appears that *Josiah Frost, Senior,* by his will dated the 30th March, 1813, after having given proportions of his estate to his three sons, made the following devise to *Josiah Frost.*

"Also, the whole of a tract of land called "*This or None,*" nevertheless, the saw mill and the coal mine situate and being on this, my son *Josiah's* part, it is my will and pleasure, and I

do hereby ordain, that my two sons, to wit, *Isaiah* and *Meshack*, shall have shares alike to the said saw mill and coal mine, with my said son *Josiah*, that is to say, one-third to them and their heirs and assigns forever."

With these papers before me, and the conceded fact that at the date of the will of *Josiah Frost*, there was open upon his lands, but one coal mine, I proceed to the examination of this obscure agreement.

In the construction of an agreement of this kind, it is important to ascertain with as much certainty as possible, what was the subject matter in the contemplation of the parties, and the thing or object about which they were stipulating.

From the introductory clause of this instrument, it would seem that the object in the view of the parties was the coal mine, or that part of the estate which was devised to *Josiah Frost*. The first words are "all our lands." This expression is limited by the words—"that is to say, *Josiah Frost's* part now sold to *John Neff*." If the parties had intended to embrace by this contract the lands devised to them by *Josiah Frost*, then when they came to limit the broad and general words, "all our lands," they would have said, meaning the lands covered by the will. But the limitation is confined to the part of *Josiah Frost*, and which he had sold to *John Neff*.

It will be seen that the subject about which these parties manifested great anxiety, was the privilege of erecting such houses as would facilitate their mining operations, and yet, what is the privilege which this contract professes to secure? The right of building a house at the mouth of the "pit,"—what pit? They could mean no other than the mine which was open upon that part of the estate devised to *Josiah Frost*. Considering these two clauses of the instrument, it is evident that the subject matter about which the parties intended to stipulate, was the open coal mine on the land devised by the will of *Josiah Frost* to *Josiah Frost, Junior*.

It is to be remarked, that there are to be found in this agreement no words of grant or alienation; but the words constantly used are "*free intercourse*," importing a purpose rather

to secure uninterrupted access to a thing already possessed, than the intention to grant or confer new rights.

Assuming this to be the true construction of the contract, the difficulty arises with respect to the clause which gives to *John Neff* "free intercourse" to the coal mines on the property left to *Isaiah Frost* by his father. And it was asked, what meaning is to be attached to the words "left to him by his father," and what object had *John Neff* in assenting to an agreement, which only gave him the privilege of using his own mine, and building upon his own land. This throws obscurity on the whole paper. The parts and clauses of the instrument are irreconcilable. The language referred to certainly carries the meaning ascribed to it by the counsel for the complainant, but I cannot permit it to overcome the intention of the parties, as manifested by the whole contract.

In the construction of all instruments, it is the duty of the court not to confine itself to the force of any particular expression, but to collect the intention from the instrument taken together; yet the judges are not authorised to deviate from the force of a particular expression, unless they find in other parts of the instrument, expressions which manifest that the author of the instrument could not have the intention which the literal force of a particular expression may impute to him. However capricious may be the intention which is clearly and unequivocally expressed, every court is bound by it, unless it be plainly controlled. *Chit. on Cont.* 73. I think there are to be found in this agreement, expressions which manifest that the authors of the instrument could not have the intention which the literal force of the expression referred to, imputes to them.

The preparation of this paper was committed to the hands of an unskilful draftsman, and I may say with the Vice-Chancellor in the case of *Clowes* against *Higginson*, 1 *Ves. and Bea.* 531, that it is extremely difficult to put any construction upon an instrument so loosely and imperfectly expressed. But this ambiguity would present an insuperable objection to the specific execution of the contract, as prayed for by the complainant.

In the case of *Colson* against *Thompson*, 2 *Wh.* 336, the Supreme Court say:—

"The contract which is sought to be specifically executed, ought not only to be proved, but the terms of it should be so precise as that neither party could reasonably misunderstand them. If the contract be vague or uncertain, a court of equity will not exercise its extraordinary jurisdiction to enforce it."

The same doctrine is announced in the case of *Clowes* against *Higginson*, 1 *Ves. and Bea.* 524; and is founded in the obvious reason, that a court of equity should never act upon conjecture.

The application, therefore, for specific performance of this agreement, as asked for by the complainant, is denied.

It is proper to state, that I consider the rights of *Isaiah Frost* and *Meshack Frost*, under the devise of *Josiah Frost, Senior*, as confined to the coal mine open and in use at the date of his will, and that their rights in this respect are not enlarged by the agreement of the 27th October, 1828. That under that contract, they have no right to any coal upon or under the land devised to *Josiah Frost*, and sold by him to *John Neff*, except what is to be found in the coal mine, which had been opened at the date of the will of *Josiah Frost, Senior*.

It has been seen, that by the will of *Josiah Frost, Senior*, there was devised to *Isaiah Frost* and *Meshack Frost*, and their heirs and assigns, one-third each in the coal mine then open upon the land devised to *Josiah Frost, Junior*. *Josiah Frost* subsequently sold his estate to *John Neff*, and the complainant has acquired the interest of *John Neff*. The bill states, that the shares of the parties entitled to this mine are capable of separation and division by surface measurement, and prays for a partition of their respective parts. The defendants in their answer admit that a division may be accomplished by surface measurement, and consent to a partition. I shall therefore order a commission to issue to four competent persons to make, if practicable, a partition of this coal mine, and to report to the court accordingly. I shall also order the papers to be referred to the auditor, that he may ascertain from the evidence in the cause, and such other proof as may be

produced before him, on the usual notice being given to the parties, the quantity of coal and its value, which has been taken from this mine by the parties in this cause, and by *John Neff*, under whom the complainant claims.

. I shall, however, direct the injunction which has been granted in this case to be dissolved. The bill charged that the mining operations were carried on by the defendants without skill or ability, and that they tend to the ruin and destruction of the mine. This certainly presented a proper case for the application of the writ of injunction. It is now settled, that a court of equity will interfere when the acts done or threatened to be done to the property would be ruinous or irreparable, or would impair the just enjoyment of the property in future. 2 *Sto. Eq.* 260. *Livingston* against *Livingston*, 6 *J. C. R.* 497. *United States* against *Gear*, 3 *How.* 121. But all the facts charged in this bill as the foundation of an injunction, have been denied by the answer, and these responsive averments of the answer stand uncontradicted, and not disproved. To stay the mining operations of these parties during the period which must elapse before the final adjustment of the cause, might inflict serious injury upon all of them, and is not demanded by the circumstances of the case.

It is thereupon this eighth day of October, 1846, adjudged, ordered and decreed by *Alleghany* county court, sitting as a court of equity, that a commission issue to *Elisha Coombs, William Ridgely, Ichabod L. Skinner* and *Thomas C. Atkinson*, authorising them, or any three of them, to enter upon, survey, lay off, and divide the coal mine on the land devised by *Josiah Frost, Senior*, to *Josiah Frost, Junior*, by his will dated the 30th March, 1813, which was open at the date of the said will, into three equal parts, whereof one part shall be allotted to *John Young*, the complainant, one part to *Isaiah Frost*, and one part to *Meshack Frost*, the defendants, if the commissioners shall be of opinion that the same is practicable. And if they shall be of opinion that the said coal mine cannot be divided without injury to the same, and disadvantage to the parties, they shall express their reasons for such opinion. And the

39    v.5

said commissioners shall make a return of the proceedings as soon as may be, subject to the further order of this court. And to said commission shall be annexed the usual oath of office.

And it is further decreed that this cause be referred to the auditor, that he may take an account of the coal taken out of the said mine, and the value thereof, by the parties in this cause, complainant and defendants, and by *John Neff*, under whom the complainant claims, from the pleadings and proofs in the cause, and such other proofs as the parties may produce before him, on giving the usual notice. And it is further decreed, that the injunction heretofore granted in this cause, be and the same is hereby dissolved.

From this decree the complainant appealed.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE and MAGRUDER, J.

By WM. SCHLEY and McMAHON for the appellant, who insisted:

1st. That the agreement of 27th October, 1828, is capable of being construed; and that its true construction is, that it applies to all the land devised by the testator, *Josiah Frost, Senior*, to his three sons, *Meshack Frost, Isaiah Frost*, and *Josiah Frost, Junior*.

2nd. That said agreement was made upon a good and sufficient consideration.

3rd. That upon the whole case, as it appeared upon the pleadings and the proof, an injunction ought to have been awarded, until the accounts were taken and partition made.

By PRICE and T. J. McKAIG for the appellees.

The case is this: *Josiah Frost, Senior*, by his will, dated 30th March, 1813, devised to his three sons, *Meshack, Isaiah* and *Josiah*, contiguous portions of his real estate, described by metes and bounds.

He gave to *Isaiah*, the use of a spring, called *Stophel's*.

spring, on *Meshack's* part. Also to *Meshack*, the use of a spring on *Isaiah's* part; and to the devise to *Josiah*, is annexed the following proviso, viz :

" Nevertheless, the saw mill and the coal mine situate and being on this, my son *Josiah's* part, it is my will and pleasure, and I hereby ordain, that my two sons, to wit, *Isaiah* and *Meshack*, shall have shares alike in the said saw mill and coal mine, with my said son *Josiah;* that is to say, each one-third, to them, their heirs and assigns forever."

*Josiah Frost*, the devisee, conveyed his part of the estate to *John Neff*, by deed, dated 1st December, 1828.

*Neff* conveyed a part of the land so purchased from *Josiah Frost*, to *Charles Williams* and *Orlando Harryman*, by deed, dated 30th September, 1835, and the residue to *John Young*, by deed, dated 22d August, 1843.

A short time prior to the conveyance from *Josiah Frost* to *John Neff*, a paper was executed between *Isaiah Frost*, *Meshack Frost* and *John Neff;* it purports to be an agreement between those parties, dated 27th October, 1828. This agreement is the foundation of the whole proceeding, the bill being for a specific execution of it, by *John Young* against *Isaiah* and *Meshack Frost*.

The original of this agreement has been lost, and two copies are to be found in the record.

The court will examine this paper in the record. The question arising on this agreement, and which forms a main branch of the controversy between the parties is, whether this agreement had reference to all the coal, in all the lands devised by the testator to his three sons, *Isaiah*, *Meshack* and *Josiah*, as the complainant contends it has, or to the coal in *Josiah's* part alone, as the defendants insist.

The complainant relies upon the language of the agreement, to shew that it was intended to cover all the lands of the three brothers, and to give to *Neff* the one-third in all their coal, in consideration of one-third in the coal in his land, which he gave by the agreement to them. The defendants rely upon the language of the agreement, and the situation of the parties,

and of their lands, together with the circumstances of the case, to shew that the agreement concerned the coal in *Josiah Frost's* part.

The facts and circumstances relied upon by the defendants to sustain their case, are:

The will of the father, an extract from which is already given, by which an equal third part is given to *Meshack* and *Isaiah*, in the coal mine on *Josiah's* part. And it is insisted, that the agreement was intended to secure and protect the interest, their access to the coal mine, with the privileges necessary to get out the coal. In support of this view, they shew, that at the date of the will, there was but one coal mine opened upon the whole estate of the testator, and that was situated on the part devised to *Josiah Frost*. This is proved by *Wm. McNair, David Waddle*, and also by *Geo. McCulloch*. That the testator did not in fact know that there was any coal on his estate, to which access could be had, but through the old mine on *Josiah's* part.

Again, the defendants shew the circumstances under which the agreement of October, 1828, was made, at whose instance, and with what view, which are proved by *Josiah Frost*.

The will was made in 1813; and in 1828 *Josiah* was in treaty with *John Neff*, for the sale to him of his land. They had gone to *Vaughn's* to have the papers drawn. While there, *Isaiah Frost* hearing of what was going on, came to *Vaughn's* also, and said that the will of his father, although it gave him and his brother *Meshack*, the right to one-third of the coal mine, yet did not give them the necessary privileges for depositing their dirt, and getting the coal out. He said they ought to have a few acres at the mouth of the mine, for the purpose of building houses for miners. He said that these privileges must be secured to them by *Neff*, if he purchased, or he and *Meshack* would buy from *Josiah* themselves. *Neff*, after a good deal of objection and complaint about the interference of *Isaiah Frost*, at length agreed to secure them these rights, and it was for that purpose the paper was drawn by *Mr. Vaughn*.

Again, it is proved by the defendants, that at the date of this agreement, in 1828, there was but one coal opening in the whole of the lands of the *Frosts,* and that was this one on *Josiah's* part, sold to *Neff.*

It appears, therefore, that the will was made in 1813; that the three sons used the one mine, on *Josiah's* part in common, under the will, until October, 1828, when the agreement was made, which is the foundation of this proceeding. That at the date of this agreement, no opening was made on the whole estate devised, but the one mine on *Josiah's* part; that the agreement had reference to that mine, and to the right given by the will to *Isaiah* and *Meshack* in that mine. That from the date of that agreement, matters stood on that footing until the 22d August, 1843, when *Neff* conveyed to *John Young,* who on the 17th February, 1845, filed his bill in *Alleghany* county court, as a court of equity, claiming a right to one-third of all the coal in all the lands devised by *Josiah Frost, Senior,* to his three sons, and praying a specific execution of that agreement, as thus understood.

The complainant, to rebut these facts and circumstances as proved by the defendants, examined *John Neff* to prove what his understanding of the agreement was, and *John Neff* proves, that he supposed, under the agreement, he was to have the same right to coal, in the lands of *Meshack* and *Isaiah,* that they had in his. He says, however, that the object of the agreement was to give them the privilege of opening mines on the land he was about to buy from *Josiah Frost,* which the will did not give them. But he says, distinctly, that no consideration passed for the interest he claimed in the coal of *Isaiah* and *Meshack.*

The plaintiff proved also by *J. S. Skinner,* that at the time of the purchase of *Williams* and *Harryman* in 1835, from *Neff, Meshack* and *Isaiah Frost* called on him, the agent who made the purchase, to insist that *Neff* had no right to sell the coal which he had purchased from *Josiah Frost* and give a warranty. After a good deal of conversation upon the subject, they agreed to join *Neff* in the deed. He proves also, that

they said at the time, that *Neff* was entitled under the agreement to one-third of the coal on each of their lands, at least this is what he understood from all their explanations of the will of their father, and the agreement of October, 1828. He proved, by *George McCulloch*, that he was one of the arbitrators to whom *Neff* and the two *Frosts* referred the question of the amount of the purchase money from *Williams* and *Harryman*, to which they, the *Frosts*, were entitled, and that the arbitrators gave *Isaiah* and *Meshack* $1500 each.

There was a survey made for the trial of the case below, and a good deal of testimony taken about position of lands, lines and divisions, but no use was made in the argument of these facts, and it is not supposed they can be deemed pertinent here.

The appellees will contend:

1st. That the agreement, supposing the copies to be true, has reference merely to *Josiah Frost's* part of the estate, and the coal mine existing thereon, and not to the whole estate, including the parts of *Isaiah* and *Meshack*.

2d. That the copies introduced by appellant are not true copies of the original agreement.

3d. That if the original agreement were produced, and the application of it to the whole property were clear, still the case is not a proper one for a specific performance.

SPENCE, J., delivered the opinion of this court.

One of the prayers of the complainant's bill is, that the court will decree the specific execution of an agreement charged in the bill to have been made on the 27th day of October, 1828, between *Isaiah Frost*, *Meshack Frost*, and *John Neff*.

This prayer the court below rejected; and refused to decree the specific execution of the agreement of the 27th of October, 1828, of which agreement, exhibit E. is charged in the bill to be a copy.

Our inquiry then in this case is, whether this agreement is such, as a court of equity will decree, shall be specifically executed?

We think the evidence proves conclusively, first, that there was an agreement made and concluded between the parties on the 27th day of October, 1828; secondly, that diligent inquiry and search has been made for the original agreement, and that according to the principles of law, and rules of evidence governing such cases, a copy was admissible; thirdly, that the paper No. 4 is proved satisfactorily to be a copy of the original agreement of the 27th October, 1828.

Let us now inquire whether the paper No. 4 contains so far, the essentials of a contract or agreement, and the intention of the parties is so manifest on the face of the instrument, as to enable a court of equity to carry out specifically by decree the stipulations of the parties, without invading any of the rules of law which govern courts of equity in the exercise (as it is denominated in the books) of its extraordinary jurisdiction.

The copy of the agreement proved is in these words:

"Articles of agreement made and agreed on this 27th day of October, 1828, between *Isaiah Frost, Meshack Frost,* and *John Neff,* heirs and representatives of *Josiah Frost,* deceased, have and do hereby fairly agree, to and with each other, that they and their heirs and assigns shall hereafter have and enjoy free and equal intercourse; that is to say, to each one undivided third part of all the coal, in and on all our lands; that is to say, *Josiah Frost's* part now sold to *John Neff.*

"And the said *Isaiah Frost* doth agree to let *John Neff* and *Meshack Frost* have free intercourse to the coal mines on his property left him by his father: and he further agrees to let *Meshack Frost* and *John Neff* have the privileges of coals on his land, and the privileges of building a house at the mouth of the pit—such a house as suits themselves for the conveniency of coal diggers.

"And also, the said *Meshack Frost* doth agree to give to *Isaiah Frost* and *John Neff,* the same privileges as above.

"And also, the said *John Neff* doth agree to give unto *Isaiah Frost* and *Meshack Frost* the same privileges as above, in coals, building houses, and making repairs, and to share alike and alike.

"And the said *Isaiah Frost* and *Meshack Frost* doth agree to give unto *Josiah Frost* and his heirs, the privilege of the interest of their two shares of coal, all that he will haul with his own teams, or his heirs, by digging the coals for himself or themselves, for which the said *Josiah Frost* doth agree to keep the banks in complete order, so as not to injure them by diging to destroy the banks."

This instrument is concluded in the usual form, signed and sealed by *Isaiah Frost, Meshack Frost* and *John Neff,* and attested by *Ben. G. Vaughn.*

It should be borne in mind in construing this instrument, that *Josiah Frost, Sen'r,* devised by his will separate and distinct portions of his land to each of his three sons; and to his two sons, *Meshack* and *Isaiah,* an equal interest in the coal mine and saw mill, which were on the part devised to *Josiah,* as he, *Josiah* himself, took under the will of the testator, and that *Josiah* had contracted orally to sell to *John Neff,* all of the land which was devised to him by his father.

It was insisted in the argument on the part of the appellee, that the first article or stipulation in this agreement served as an exposition of the whole instrument, and by force and operation of the words "that is to say, *Josiah Frost's* part now sold to *John Neff,*" restricted and confined the whole contract to the land sold by *Josiah Frost* to *John Neff.* Let us test the correctness of this construction by applying it to the agreement on the part of *Isaiah Frost,* and it will read thus: "and the said *Isaiah Frost* doth agree to let *John Neff* and *Meshack Frost* have free intercourse to the coal mines on his property left him by his father, (that is to say, *Josiah Frost's* part now sold to *John Neff;*) and he further agrees to let *Meshack Frost* and *John Neff* have privileges of coal on his land, (that is to say, *Josiah Frost's* part now sold to *John Neff;*) and the privilege of building a house at the mouth of the pit—such a house as suits themselves for the convenience of the coal diggers." The agreement on the part of *Meshack Frost* and *John Neff* are the "same as above."

This construction of this agreement renders it inoperative

and unmeaning. If the stipulations in the agreement are to be confined to "*Josiah Frost's* part now sold to *John Neff*," what benefit or privilege can *Meshack Frost* and *Isaiah Frost* give or confer upon *John Neff* in his own land and coal?

It is well settled that courts of law will not put such a construction upon instruments of this kind as renders them null and void, if they can without violating any rule of law so construe them, as to give to the contracting parties a meaning and intention operative and binding in law.

The only words or expression in this agreement which can possibly cause any doubt as to the intention of the parties, are the words, "that is to say, *Josiah Frost's* part now sold to *John Neff*." The agreement commences thus: "Articles of agreement made and agreed on this 27th day of October, 1828, between *Isaiah Frost, Meshack Frost* and *John Neff*, heirs and representatives of *Josiah Frost,* deceased;" and as the intention of the parties was, that they and their heirs and assigns were thereafter to have and enjoy free and equal intercourse, "that is to say, to each one undivided third part of all the coal in and on all our land," it was necessary to shew what land, so far as *John Neff's* obligation related, was intended by the words "all our land," for *John Neff* was neither the heir nor representative of *Josiah Frost,* deceased, and therefore the expression "all our land," would have included all the lands which *John Neff* owned, and the expression "that is to say, *Josiah Frost's* part now sold to *John Neff*," explains what land was intended on *John Neff's* part in the expression "all our land."

Much reliance in the argument was placed on the want of consideration, or the inadequacy of consideration in this agreement. A court of equity does not affect to weigh the actual value, nor to insist upon the equivalent in contracts, where each party has equal competency. When undue advantage is taken, it will not enforce that. Improvidence or inadequacy do not determine a court of equity against decreeing specific performance. *Sullivan vs. Jacob,* 12 *Cond. Eng. Cas. in Chancery,* 235.

We forbear to make any comments in reference to the argument upon the effect of the parol evidence in this case, for the

reason that it would be admissible to prove fraud, or omission by mistake only; and not the intention of the contracting parties.

We do not consider the complainant in this case obnoxious to the charge or consequences of champerty, either upon principle or authority.

The decree is reversed with costs to the appellant, and the case remanded for further proceedings.

DECREE REVERSED AND CAUSE REMANDED.

The decree of this court adjudged that the agreement of the 27th October, 1828, which is alleged and set forth in the appellant's bill of complaint is satisfactorily established by the evidence in the cause, and that paper marked No. 4 of said evidence and referred to in the testimony of the witness, *George McCulloch*, is by the testimony of said witness proved and established as a copy of said agreement; and also, that the said complainant, *John Young*, as the assignee of *John Neff*, one of the parties to the said agreement, is entitled in equity to demand and have a specific execution of the said agreement, as against the other parties to the same, the said defendants, *Meshack* and *Isaiah Frost*; and also, that the said agreement is not by the words "that is to say, *Josiah Frost's* part now sold to *John Neff*," limited and restricted in its operation to *Josiah Frost's* part of his father's estate, devised to him by his said father, but that said agreement according to its true construction, as to all the rights, interests, and privileges thereby and therein respectively granted to each other by the parties to the said agreement, does extend to and embrace all the lands which were respectively devised to the said *Meshack Frost*, *Isaiah Frost* and *Josiah Frost*, by their said deceased father, *Josiah Frost*.

It is therefore by this court, and the authority thereof, further adjudged, that this cause be, and the same is hereby remanded to the said *Alleghany* county court as a court of equity, in order that the said complainant may by the decree of said court have partition of his rights and interests under said

agreement, as prayed for by his bill, in conformity to the principles of this decree, and that such further proceedings may be had in the cause as are required by the principles of this decree, and the rules of equity.