# John Young vs. Meshack Frost, Isaiah Frost, and others.

A former decree of the Court of Appeals, so far as it decided points which were made before the Court of Appeals, or which were presented by the record, is conclusive, and no error could be imputed to the court below, if in its subsequent proceedings it conformed to the principles of that decree.

Facts which had occured before the first decree in the court below, ought to have been presented before the original hearing. Parties must indicate their rights in due season, and in proper order.

Construction and specific execution of a contract relative to coal mines

Compensation in money equal to the value of the coal at the time it was sold, would not in this case be the most equitable mode of making the partition. Coal should be assigned to the complainant for his full share, regard being paid to quantity and quality, if it can be done, with reference to accessibility and convenience in mining of all the parties.

A decree for the partition of lands, need not direct the parties to execute deeds to each other.

APPEAL from Allegany county court, sitting as a court of equity.

This case has already (a part of it,) been before the Court of Appeals, and so much of it will be found reported in 5 *Gill,* 287.

The bill was filed by the appellant Young, against the defendant, for an execution of an agreement for a partition of coal owned by them, in common, and an account of the coal already taken out. It stated that Josiah Frost, Sen., by his will, devised certain lands in Allegany, having coal thereunder, in several and distinct portions to his three sons, Meshack, Isaiah and Josiah; that John Neff became the purchaser of Josiah's part, and on the 27th October 1828, entered into an agreement for an interchange of their rights to the *coal* under the lands devised to the three sons. Afterwards the complainant Young became the assignee by deed, of Neff's part, and of all of Neff's rights under the agreement. The complainant claims an undivided third part of all the coal under the lands, devised as aforesaid by the testator to Meshack,

48    v.1

and Isaiah, admitting that each of them was entitled to a third part of the coal under the land devised to Josiah.

The defendants by their answer insisted, that the agreement, if proved, gave to Neff, as assignee of Josiah, no right to the coal under their lands, and that it had relation entirely to the coal under the lands of Josiah; and that the effect of that agreement was to give to Meshack and Isaiah, an equal interest with Neff to the coal under his part, without giving to him any interest in the coal under the land devised to Meshack and Isaiah.

Upon the former appeal, this court decided, that the agreement was satisfactorily proved; that the complainant, Young, was entitled to a specific execution of it against Meshack and Isaiah, that the said agreement, according to its true construction, was not limited, and restricted in its operation to the part devised to Josiah by his father, but does extend to, and embrace all the lands devised to the three sons. This being a reversal of the decree of the court below, the cause was remanded to Allegany county court, as a court of equity, in order that the said complainant may, by the decree of said court, have partition of his rights and interests under said agreement as prayed for by his bill, in conformity to the principles of this decree, and that such further proceedings may be had in the cause as may be required by the principles of this decree and the rules in equity.

On the 17th May 1848, Young, the complainant, filed his petition, praying a commission of partition to carry out the decree of the Court of Appeals, and therein states, that the defendants, (the Frosts,) before that decree was made, conveyed certain parts of the land which that decree covered, and showing the parts conveyed and to whom conveyed. A commission of partition was issued by consent, wherein the commissioners were directed to go upon the parcels of land, and *measure the coal embraced by the decree of the Court of Appeals*, in order to a partition.

The commissioners in their report state, that they have discovered that parts of the land had been conveyed away,

some before the agreement and some after it, but before the bill was filed, and some after the latter period; and that the complainant Young insists upon a division of the coal in said lands, as if the division was to be made immediately after the date of said agreement; whereas the defendants insist, that they should look at the property as it stood on the day of the filing of the bill, and divide said coal as the parties were seized of it at that time. They therefore pray the court's instructions.

Young then filed a petition, setting forth an agreement between the parties, in which it is admitted, that Meshack and Isaiah Frost have sold to *bona fide* purchasers, without notice, parcels of the land covered by the decree of the Court of Appeals, and have received the purchase money therefor; and as they will be entitled to hold their lands, the petitioner claims it as equitable, that he should have set off to him one-third of all the coal under the lands devised to the three, to be so located and laid off, as to be entirely clear of the lands so sold as aforesaid by Meshack and Isaiah.

The agreement referred to by the complainant is as stated, and also leaves open the question, whether the effect of said sales by Meshack and Isaiah to *bona fide* purchasers, as stated, was to give a full and perfect title to the purchasers of said lots?

The Frosts, in their answer, deny the right of the complainant to the instructions he asks for, and say that in the sales they made, they professed and intended to sell, and did sell, their own right and title to said lands, and no more, and did not sell or profess to sell any right of any other person to said lots. They aver, that Neff, from 1828 until 1843, had full notice of every lot being sold, permitted the purchasers to pay the purchase money, and never objected, nor did he intimate to the purchasers that he had any claim. Neff bought of Meshack one of the lots, and afterwards sold it to Shephard, to whom, at Neff's request, it was conveyed by Meshack. They insist, that the complainant's claim is a right to the thing, and not a personal claim or demand against them; that it is a claim to the coal in said lands, and if lost by his own neglect, he cannot have a right to an indemnity against

them; and, moreover, that the commissioners shall make par-tition of the coal which they find in the lands, which are still in the possession of the parties, and not of the coal held ad-versely by strangers not parties to the suit.

A commission was issued to take testimony, and by one witness it was proved, that he had a conversation with Neff, about the time he made sale to Young, when Neff said he was about selling to Young his proportion of the coal under the lots in Frostburg, and upon witness asking him whether he thought the people of Frostburg would let a company take the coal under their lots, after paying high prices and getting a general warranty, and observing that he did not think they would, and he would not; Neff's reply was, that he thought they would have to look to the Frosts. The same witness also stated, that he thought that Neff had a knowledge of the sales of the lots, because he was living in that section of the country all the time, and that Neff never, to his knowledge, made claim to the coal under the said lots before the conver-sation just stated.

Another witness also thought, that Neff must have know-ledge of the sales, as he lived within half of a mile of the town, until about ten years ago, when he removed to his pre-sent residence, about two miles therefrom, was engaged in selling coal to persons in town, and was frequently there;— the witness was one of the purchasers of the lots, but had no knowledge of the claim until he paid the purchase money.

By a third witness, there was similar proof.

The town of Frostburg was laid out in the year 1816, and before the death of the testator, and conveyances were made, commencing 10th January 1817, and from time to time, until the original bill was filed in February 1845.

The court below, after expressing its opinion, that "the power to compensate the complainants *in kind* for the coal under the lots covered by the town of Frostburg, is very doubtful; and that if it were clear, they did not consider under the proofs accompanying the application that the case

before them, was one for its exercise," gave these instructions to the commissioners.

1st. That they proceed to make partition amongst the complainants and defendants, Meshack and Isaiah Frost, of the coal in the lands held by them respectively, *at the date of the filing of the bill, viz :* 17th February 1845.

2nd. That in making said partition, no allowance is to be made, or notice taken, of the coal under the lots sold by the said Meshack and Isaiah, prior to the filing of the bill, 17th February 1845.

Another instruction was given relative to the mode of making the partition, which is not complained of.

The commissioners in July 1849, made their report in conformity to, and in pursuance of said instruction, making partition among the parties only, of the lands held by them, at the time when the bill was filed. To this report the complainant excepted, because the "commissioners made no allowance to the complainant in making said partition for the coal under the lots of the town of Frostburg, sold by Meshack and Isaiah Frost, as prayed by complainant, and mentioned in agreement of counsel, or for the coal under any part of said lots."

The exceptions were overruled by the court below, the report finally ratified, and a partition decreed, as made and reported. This appeal was thereupon taken by the complainant.

There was an agreement signed by counsel, and marked GAP, stating that Frostburg was laid out in the lifetime of the father of the Frost's ; what lots were sold to purchasers before the agreement ; what lots after the agreement and before the bill was filed. The two Frost's, it is admitted made the sales and received the purchase money ; that the purchasers took possesion of their lots at the time of their purchases; that they were *bona fide* purchasers, without notice of the complainant's claim ; and were, when the bill was filed, and still are, in adverse possession. It leaves open the question, whether said sales and conveyances gave to the purchasers a

perfect title to said lots, or merely transferred the right and interest of said Meshack and Isaiah.

Some persons (Thomas J. and William W. McKaig,) contracted for parcels of the land.

The case was argued before ECCLESTON, TUCK and MASON, J.

By *Wm. Schley* and *McMahon* for the appellant, and *McKaig* and *Price* for the appellee.

*Schley* in behalf of the appellant.

The original bill sets out the agreement between the parties. The defendants denied the existence of any such agreement. It was established by the Court of Appeals. 5 *Gill*, 314.

This decree of the Court of Appeals and everything included in the division, is conclusive upon the parties. 3 *East's Rep.*, 346. 44 *Law Lib.*, 435, 437, 440. 3rd *G. & J.*, 103. 5 *G. & J.*, 500. 1 *How.*, 134. 3 *How.*, 413, 424.

In the case of *the Farmers Bank of Virginia vs. Merchants Bank of Baltimore*, which has not been reported, even a point decided by a divided court, was held to be binding upon the parties.

If the decree be conclusive, what does it decide? It establishes the agreement, and that according to that agreement the complainant is entitled to an undivided third part of the coal, under all lands devised to the defendants Meshack and Isaiah, and by them holden at the time of its execution.

The equitable rights now insisted upon, existed before the former decree. The parties failed to present them, and it is now too late to insist upon them.

The *value* of the coal at this time, can have no effect upon the claim of the appellant: the claim is precisely the same, that it would have been, if the coal was of much less value. A specific performance has already been decreed. This decree cannot now be reviewed, but must be carried out without regard to its effect upon the parties. The appellant claims no

extension of it, but that the decree, as it was pronounced, be performed.

Young, and the two Frosts, are the only proper parties to this suit. There were no exceptions for the want of proper parties, as required by the act of 1832.

We did not make those who were purchasers without notice, parties.

There is no such thing as a *bona fide* purchaser without notice; unless there be an actual deed. An equitable title will not do. 2 *Leading Cases in Equity*, in 71 *Law Lib.*, 130, 131, 161, 163, 166. 5 *Gill*, 481, 482.

Our claim is good against the Frosts, to be recovered out of the land they still hold, even although we may have no right to go against those who have deeds.

The claim of the purchasers ought to have been relied on before the first decree.

As to losing rights by laches, see 1st *Gill*, 502. The Frosts knew of our rights.

At law, partition is a fixed and settled thing:—equity will mould and arrange the matter so as to do equity. 1 *Story's Eq. Juris.*, secs. 654 to 659. 1 *Barb. (n. E,)* 501, 507, 509. 3 *Paige*, 470, 474. 8 *Paige*, 513, 515, 516. 3 *Edwards' Reports*, 323. 8 *Price's Ex. R.*, 518. 2 *Hoffman's Ch. R.*, 28, 29. 4 *Barbour's Reports*, 228, 229. 2 *Daniel's Chan. Prac.*, 1334, 1336. *2nd Sch. & Lefroy*, 372.

It is further objected to this decree, that it should have directed deeds to be executed.

*McKaig* for appellee.

We do not resist the decree. The court only decreed partition.

The decree cannot mean, "all the land devised," because twenty acres of that land was, before the agreement of 27th October 1828, sold to Naff, and by him to Williams and Harryman.

As to decree upon the merits, 3 *How.*, 413. See 44 *Law Lib.*, 436, *top-pag.*, *Smith's Leading Cases.*

For the effect of a former verdict, see 4 *G. & J.*, 355.

It makes no difference what the decree directed, if it could not be executed.

Young bought, knowing the right of Neff to be disputed:—purchased a law-suit.

Compensation in partition, depends upon equitable principles. Neff laid by for sixteen years, without attempting to enforce his present claim. The assignment to Young was made in 1843.

Neff, as well as the Frosts, understood the agreement to be very different from the court's understanding of it, and acted accordingly; Neff stood by and saw what was going on, without making any objection. 5 *Munford*, 108, 110, 116. 1 *Story's Eq. Juris.*, sec. 566.

The chancery court will not always allow compensation; but in some cases will leave the party to his remedy at law. Neff might have sued at law, for the coal taken away : if he had not lost his remedy by limitations.

Chancery will assess damages, if the remedy be doubtful at law; but not if the case be not equitable. 1 *Hoff. Chan. Rep.*, 133.

If compensation is to be made, then how, or on what principles would the damages be assessed ? We say, that what Neff paid should be the rule or guide, and not the present value of the land. 2 *A. K. Marshall*, 488. 2 *Bibb*, 434. The value of the land at the time the contract ought to have been performed, furnishes the rule by which to assess the damages.

See 2 *White and Tudor's Cases* in 71 *Law Lib.*, 534. 8 *Price Ex.*, 518.

No deed was necessary.

*Schley* referred to act of 1831, ch. 205, sec. 3, with respect to recording bonds of conveyance, and act of 1825, ch. 203, sec. 1, which gives to the deed the first recorded, the preference.

2 *Story's Eq. Jurisprudence*, 1502, was cited by *McMahon.*

*Price* for appellees.

I admit the conclusive effect of the former decree in this case, but of what is it conclusive? Five suits were blended in this bill. Partition, specific execution, injunction, compensation, and an account.

The decree is for partition; the question now, is in regard to compensation. The bill, answer and testimony, when the decree was passed, were all silent in regard to the facts on which this question arises.

In 17 *Pick.*, 8, *Arnold vs. Arnold,* the verdict did not settle the right of way, although damages were recovered for obstructing the way. See 4 *G. & J.*, 355, *Shaeffer vs. Stonebreaker.* 1 *Greenleaf's Evid.*, 528.

The controversy or issue in the former decision, was, whether the agreement between Neff and the Frost's related to the land devised to Josiah Frost only, or included the lands devised to the other two sons also. See *Judge Martin's Opinion*, 5 *Gill*, 301, 302.

When the court said "all the lands devised," they mean to say the agreement embraced the three parts, that the agreement is not confined to Josiah's part, but includes all the lands.

It is a general interlocutory decree for a partition. The first decree in partition is interlocutory. *Alexander's Ch. Plead.*, 165.

This decree is final as to specific performance; it is binding as to partition; but has no binding effect, as to compensation; and compensation is not partition. *Story's Eq. Juris.*, secs. 655, 666, *(b.)*

A court of equity may give or refuse compensation—may give compensation *in kind* or in damages.

The town of Frostburg is in dispute, and the question is, are the lots of the town to be included in the partition, so as to give Young one-third of the coal under these lots, or can he claim only one-third of the land and coal, exclusive of these lots?

Prayer of bill, 5 *Gill*, 294. Decree, *Ibid*, 314. Young is
49    v.1

entitled under the decree to one undivided third part of the land and coal, exclusive of the town. The owners of the lots in the town, have a better title than either the parties.

As to compensation. See *Adams' Eq. Doct.*, 89, 90, in 68 *Law Lib.*, 111. Compensation in money is to be estimated by the price of purchases.

As to partition, "it never occurs in the case until we come to the decree. The Court of Appeals send the case back to make partition," in conformity to the principles of this decree, and the rules of equity. It is nothing more than a decretal order.                                                          •

See 2 *Barb. Ch. Practice*, 728, 735, 739, and *Alexander's Practice*, 363, as to the manner of making partition.

1 *Young and Colyers Exch. Rep.*, 546, and *2nd vol. p.* 586. In making partition, the court will adjust all the equities of the parties.

As to the equities of the parties : The town of Frostburg was laid out before the agreement; the coal was sold when worth very little. Neff bought a lot and sold it to Shephard. Neff stood by for seventeen years. Young bought a law suit. *Adams on Eq. Doct., top-p.*, 107, in 68 *Law Lib.*, and also p. 163.

We contend :

1st. That the decree of this court does not touch the question, whether the Frosts shall be charged with the lots sold after the date of the agreement? because the question was not made in the former record.                                          -

2nd. That after Neff had stood by for upwards of sixteen years, without making any claim, (except in 1835, when it was claimed, and the claim rejected,) and saw the lots sold, deeded and occupied, when the coal had no value of any kind, and thereby lost his rights against the purchasers, it would neither be equitable nor just to give him, at this time, the enhanced value of the coal.

3rd. That as the lots were sold when the coal had no value, and Mr. Neff stood by and made no objection, equity will not now aid him to recover a compensation for that coal, at this

time, when the coal, under one lot now, is worth more than the coal under all the lots at the time they were alienated.

4th. That the court have no power to compensate, *in kind*, on a bill for partition, under the circumstances of this case.

5th. Because Josiah Frost, and his assignee, Neff, had both purchased and sold to third parties, without notice, parts of the lands devised to Meshack and Isaiah.   And

6th. Because if the lots were sold, without any reservation of the third part of the coal, it was owing to the laches of the said Neff, and at a time when neither the Frosts nor Neff, considered the coal under the lots of value, and at a time it had no value.

7th. Because the half of the land devised to Isaiah Frost, remaining after the sale of the lots, had been sold to third parties, without notice; the last parcel to Thomas J. McKaig, by his agreement of the 5th January 1845, and by the agreement of the said Isaiah and Meshack, of the 30th January 1845, who, by their petition filed in the cause, set out their title, and call upon the complainant to answer, which he has not done; and no partition could take place, until that of T. J. & W. W. McKaig, had been disposed of.

8th. A decree for the specific execution of an agreement, being within the discretion of the court, will not be granted, except to promote the ends of justice; and although the decree of this court in the first appeal *may, by its letter,* cover the lands covered by the Frostburg lots, yet, as the matters in controversy in the present appeal, were not before this court in the former appeal, nor intended to be touched by its decision, this court will not so enlarge the effect of that decision, as to work injustice to the appellees, which would be the effect of the compensatory partition, contended for by the appellants.

*McMahon,* for Appellant.

What is the effect of the former decree of this court? The ground taken by our adversaries is, that the conclusiveness of the decree does not depend upon the claims which the plain-

tiff makes, but upon the defence which is set up, and when that is changed the effect of the decree is avoided. We all agree that the decree is binding, but we differ as to what the decree is, or how much it includes. He cited act of 1845, ch. 367. 5 *Barbour*, 62. 4 *John. Ch. Rep.*, 276.

The bill sets out five matters:—1st. The agreement:—2nd. The construction:—3rd. The account:—4th. The specific relief:—5th Partition.

The defendants came in and answered:

The court below was bound by the decree of the Court of Appeals to direct a specific execution. It had no longer that discretion which courts of equity have in an original suit. It is to pass a decree in a case, which has already been taken to a superior tribunal, and to conform its decree to the instructions of that superior tribunal.

The decree or judgment is final, not only as to what was decided, but also as to what could have arisen in that case. 1 *John. Cases*, 492, 502, 503. 1 *Blackford*, 361. 6 *G. & J.*, 312. 9 *John Rep.*, 243.

The only defences made to our petition were:—1st. That the defendants did not convey away any of the complainant's rights; and 2nd. If he did, he, Neff, stood by and did not object.

There was a good consideration given by Neff in the agreement. He allowed the Frosts to open mines anywhere on his lands.

Laches cannot avail. The title claimed must be a secret one, unknown to the other party, and such other party must have expended money in ignorance of such secret title.

Ignorance of the law of the contract does not excuse the Frosts. 2 *H. & J.*, 432. 1 *Gill*, 29. 12 *Peters*, 55. 5 *Gill*, 309, 310.

There is proof that the Frosts knew that Neff claimed the land and admitted his claim.

As to laches: See 1 *Gill*, 480, 481, 501, 502. The Frosts knew our title, or were bound to know it.

What right had the complainant to prevent the Frosts from

selling the town lots? at all events, *the surface*? There is no evidence that the appellants saw the deeds. See *Story's Equity Jurisprudence*, 385, 391, as to laches.

Frost had the original agreement or a copy of it, and he did not produce that copy, although he denied the copy that the appellant produced.

By the decree of the Court of Appeals, the rights of the parties under the agreement were certainly settled and Young's title established. The decree fixed it, that Young was entitled to one-third of the coal in all the lands; that there should be a specific execution, and, as ancillary, partition was to be made.

Have the Frosts so conveyed away the town lots, as to shut out the equitable title of the appellant? Yes, the legal title shuts out the equitable. 6 *John. C. R.*, 271, 278. 4 *H. & McH.*, 482. 3 *Bl.*, 586. 2 *Story's Equity*, 1502. 58 *L. L.*, 88, 89. 67 *L. L.*, 202, 206.

The defendants say, that they only conveyed their own title and not Young's. If the grantor's conveyance of his own title does not shut out the secret or unknown equitable title, in order to do it, it is necessary that the grantor should also profess to convey the title of him who has the equity, and that conveyance itself would be a *notice*.

The cases cited by the defendants are cases in which pecuniary compensation was given, there not being land enough to give the purchaser what he bought. Whenever in equity, the thing on which the claim rests exists, the court will act upon that thing specifically.

A court of equity will, on partition, make such a division as will do justice, and need not divide equally in quantity.

1 *Story's Equity Juris.*, 656, top-pag., 732. 1 *Barbour*, 509. 4 *Barbour*, 229, 230.

As to partition where expensive improvements have been made: 1 *Story's Equity*, sec. 655. 1 *Barbour*, 507. 1 *Hoffman*, 28. 3 *Edwards*, 323. 6 *Dana*, 206.

The grounds upon which a reversal of this decree is asked, we sum up in these words:

1st. That by the decree of the Court of Appeals, establishing the existence and construction of the agreement of 1828, decreeing its specific execution, and remanding for partition according to said agreement and decree, the complainant's right to an undivided third part of the coal under all the lands devised to the defendants, Meshack and Isaiah Frost, was conclusively established against them, the said Meshack and Isaiah; and it was therefore not competent to said defendants, after the remanding, to set up the defence, that complainant had lost the benefit of said agreement, or was not entitled to its specific execution, as to any part of coal under the lands embraced by said agreement, from the alleged laches of the complainant or his assignor Neff.

2nd. That even if it were competent to said defendants, after said decree, to set up the defence, that the complainant's rights under that agreement had been lost, as to the coal under any part of the lands bound by that agreement, because of the conveyance of such land by said defendants to purchasers for value and without notice of said agreement, and the alleged laches of the complainant or his assignor Neff, in permitting such conveyance to be made without objection or notice; still such a defence could not avail in this case to affect or impair the equitable rights of the complainant under said agreement, as against said defendants; that such alleged laches, if conceded, could not upon any principle of equity, work a forfeiture to the said defendants of the complainant's interest in the coal under the lands thus conveyed away, or entitle them to keep that interest, in violation of their said agreement, merely because of their conveyances and appropriation of the whole coal under said lands to their own use and benefit, even if done in ignorance of the rights given by said agreement; and that above all, such alleged laches could work no such consequence in this case, inasmuch as said defendants, as parties to said agreement of 1828, had, all the time, as full knowledge of it as Neff or the complainant, and were therefore chargable in law with a full knowledge of Neff's rights under it as against them; and were moreover

not only bound to know the complainant's rights under it, but had also in fact express knowledge of the claim to those rights by Neff, at the very time when they themselves claimed and received from Neff their equal share of the coal rights under that part of Neff's lands sold to Williams and Harryman.

3rd. That therefore the complainant's right to the one-third of the coal under all the lands devised, as originally given, by said agreement and as decreed by the Court of Appeals, *existed in full force and unimpaired, as against said defendants, at the time of partition,* and gave him *a clear equity as against said defendants, Meshack and Isaiah, at that period,* to have said agreement fully executed, and his rights under it fully enforced against them, if practicable, and to have such a partition made, as against them, if within the power of the court, as would produce that result; that, as by the clear result of the admission in this case, the said defendants, whilst bound by the equity of the complainant arising from their own agreement, had so conveyed away and been paid for a part of the lands bound by it, as to preclude the complainant's resort to them in the hands of the purchasers, and had thus *in effect* used up, for their own purposes and benefit, all that part of the lands so conveyed, the court below, as a court of equity, in making said partition, might and ought to have adjusted all the equitable rights of the parties, arising either from the said agreement or from said conveyances in violation of it, and to have made such allotment of shares, or such adjustment of compensation, as would have accomplished the entire equity of this case, and would not permit the said defendants, by the partition made under its directions, to receive more than their equal shares in violation of their own agreement; and that the court below, in making said partition, might and ought to have enforced and secured these equitable rights of the complainant, by allotting, to him, at his election, from and out of the coal under the lands not conveyed away and held at the filing of the bill, his full one-third of the whole, so as to make his share equal to that in

fact received by the other defendants, either by their own appropriation or on the partition, or by allotting to the complainant, out of the lands held at the filing of the bill, a portion of the coal under them, equal to that which he was entitled to under the lands so conveyed away, and then dividing the residue equally, or by assigning to said Meshack and Isaiah, as a part of their respective third parts, the coal under the lands by them respectively conveyed away, which will thus enure to the benefit of their grantees; or by some other compensatory adjustment, securing to the complainant his said equal rights, before partition made or as a part of it.

4th. That the complainant's right to the coal being a purely equitable title, founded on said agreement of 1828, the court below, in enforcing said agreement and decreeing partition, ought to have decreed conveyances from the said defendants, Meshack and Isaiah, to the complainant, for the part allotted to him on the partition made, so as to vest in him the legal title; and therefore if the partition made had been right, the court below erred in not decreeing such conveyances.

Tuck, J., delivered the opinion of the court.

So much of the present record as was before the court on the former appeal, is sufficiently stated in 5 *Gill*, 287. On that appeal, the decree of Allegany county court, as a court of equity, was reversed, and the cause remanded for further proceedings. After which, to wit, on the 17th May 1848, the appellant, (the complainant below,) filed his petition stating, that the defendants, Meshack and Isaiah Frost, had conveyed away parcels of the lands covered by the decree; shewing the names of the grantees, and the dates of the conveyances: and praying that a commission might issue to make partition of the coal according to the decree of the Court of Appeals. A commission was issued, and afterwards, the commissioners made a report, suggesting that difficulties were presented by reason of these conveyances, the complainant claiming one-third of all the coal that the parties owned at the date of the agreement, in 1828; and the defend-

ants insisting that the commissioners should look at the property as it stood on the day of the filing of the bill, and divide said coal as the parties were seized of it at that time;" and they asked the court's instructions as to the mode of making the partition. In the further progress of the cause, an agreement was filed, by which it appeared that the town of Frostburg was laid out in the lifetime of the father of the defendants, as the lands devised by him to his sons : that these town lots were sold to different persons, at various times; some before the agreement of 29th October 1828; some between that date and August 1843, (when Young purchased for Neff;) others after that time and before this bill was filed, (17th February 1845;) and others since the commencement of the suit; that these lots contained in all, about fifty seven acres; and were sold by the defendants, who received the purchase money. It also shews that the purchasers of the lots took possession of them, that they were *bona fide* purchasers for value, without notice of the complainant's claim, or the title under which he claims, and that they were, at the time of filing the bill, and continued in adverse possession of the same, claiming title in fee. The agreement, however, stipulates "that notwithstanding its admissions, the question shall still be open." "Whether the effect of the said sales and conveyances by Meshack and Isaiah, to *bona fide* purchasers without notice at the time of said sales and conveyances, of the claim of the complainant, or of the agreement under which it is made, was to give a full and perfect title to the purchasers of said lots, or merely to transfer the right and interest of the said Meshack and Isaiah." The answer of Meshack and Isaiah Frost to this petition, denies the right of the complainant to the instructions prayed for, and insists, that by these conveyances, they proposed to sell, and did sell only their own right, title and interest in these lots, and not that of any other person, They also aver that Neff had knowledge of these sales, and permitted the purchase money to be paid without giving any notice of his claim; and that the purchasers never heard of any such claim until this bill

50     v.1

was filed. They contend also that the complainant's claim, under the agreement of 1828, is a right to the thing, and not a personal demand against them; that if this coal has been lost by his own neglect, he cannot have any indemnity from them; and that the commissioners should make partition of the coal in the lands which they find still in the possession of the parties, and not of the coal held adversely by strangers, who are not parties. A commission was issued and proof taken, to which it is unnecessary particularly to refer. A partition was also made in conformity with the instructions of the coal in the lands held by the complainant, and defendants Meshack and Isaiah, at the date of the filing of the the bill, to wit, 17th February 1845; and making no allowance for, nor taking notice of the coal under the lots sold by said Meshack and Isaiah, prior to the filing of the bill. From the decree ratifying this partition, the present appeal is taken.

It is contended, on the part of the appellant, that the very questions which we are called upon now to consider, were conclusively decided by the decree of this court, in 5 *Gill* 314; and that the defendants therefore could not, when the cause was remanded, set up the defence which they relied upon, in opposition to the pretensions of the complainant. The counsel for the appellees, however insist, that the decree which was heretofore reviewed, being interlocutory and not final, this court is not concluded by the decision on that appeal. If that was the character of the decree, and the appeal did not lie, we think the objection cannot now be made. 3 *Howard*, 413. But the case was within the provisions of the act of 1845, ch. 367, the court having "determined questions of right between the parties, and directed an account to be taken, on the principle of that determination," and though not a final decree, the decision of the Court of Appeals must be taken as conclusive, on all "points which were made before the court of Appeals, or which were presented by the record," 1832, ch. 302, '6, and no error can be imputed to the court below, if its subsequent proceedings have been in conformity with the principles of that decree. 7 *Gill*, 244. 7 *Gill*, 333.

We must look to the decree of the court, to ascertain the scope and extent of their decision, from which, it is manifest, that the alleged agreement between the Frosts and Neff, was established; that Young, as assignee of Neff, was entitled to have execution of the same, according to the construction asserted in his bill, and that he was entitled to partition of the coal, according to that claim. And the cause was remanded for partition, upon these principles, and the rules of equity. The counsel for the appellees, however contend, that the decree must be considered with reference to, and as conclusive, only in view of the case then before the court; and that, as the matter subsequently brought into the cause, materially changed its character, by presenting new equities between the parties, it is competent for this court now to mould its decree, according to the case disclosed by the whole record. Whatever weight this view may be otherwise entitled to, it cannot change the construction placed upon the agreement. Nor do we perceive how these alleged new equities can be allowed to avail the defendants, except in disregard of the decree of the Court of Appeals, both as to the right of the appellants, to a specific performance of the agreement, and as to the character and extent of his relief. This case was before the court below upon the bill, answers, and proofs. The defendants had contested the right of the complainant to the relief he sought. And the court had decided the cause upon the merits as there presented. The Court of Appeals, in renewing that decision, passed a decree by which they determined the questions of right in issue between the parties, and remanded the cause, that the appellant might have relief in the court below, according to the law of the case, as there established by this court. The facts relied on by the defendants, after the cause was remanded, had occurred before the first decree, and might have been made part of their defence to the original bill, and we think should have been presented then. Every person is bound to take care of his rights, and to vindicate them in due season, and in proper order. This is a sound and salutary principle, intended to prevent litigation

and to preserve peace. 1 *Johns. Cases,* 502. 6 *Gill and Johnson,* 312. If this were an application to let in the defences, now relied on, by way of amendment or bill of review, the appellees would be met by a very stringent rule, that which requires an affidavit, that the party did not know before of the circumstances on which the application is made. 6 *Harris and John.,* 311. *Md. Ch. Pr.,* 62, 179.

The effect of decisions by the Court of Appeals, upon subsequent proceedings in the cause, has been fully considered in a recent case in this court. *McClellan vs. Crook,* 7 *Gill,* 333. A party applied to the chancellor, after the cause had been remanded by the Court of Appeals, to be allowed by way of credit, for certain rents which accrued, pending the appeal, and which were within the principles established by the Court of Appeals, but could not have been introduced into the cause before. The chancellor refused the application, and this court said that to have granted the relief "necessarily required the chancellor to open the decree of this court, which was intended to be conclusive on the chancellor." * * * "Upon the record before the chancellor, and upon the questions within that record, this tribunal has acted, and passed a definite decree, in relation to the entire subject presented to the chancellor and to this court   Thus the whole subject then in litigation, has been finally disposed of by the decree of this court. That decree has become the law of the case, and the chancellor cannot otherwise deal with the matters, thus adjudicated, than in the form prescribed." In that case equities depending on the principles of the decree were rejected, because of its conclusiveness; although they arose, after the decree of the chancellor was passed, and could not have been brought before the Court of Appeals, when the case was before that tribunal; and although they were afterwards presented to the chancellor, before the decree of this court was executed, and the mortgaged estate sold. Here the matter had arisen, and was known to the parties, before their answer were filed, and, if available at all, was proper to be presented at that time. The subjects then in litigation

were the agreement, specific performance, partition, and account, as asserted in the bill of complaint. The facts now relied on, as sufficient to warrant this court in re-moulding the decree of the Court of Appeals, were pertinent to the last three of these questions; and not having been introduced before "these subjects of litigation were disposed of." We think it cannot be done now, without "opening the former decree of this court, which was intended to be conclusive." If it were newly discovered matter, sought to be availed of in a proper form of pleading, the case might rest on different principles.

But it is said that further proceedings were to be had not only according to the principles of the decree, but also "according to the rules of equity;" and that this part of the decree authorises the court to examine the whole record, and to decide according to the equity of the case as now presented. We do not think that these words designed to impair in any degree, the conclusiveness of the decree, as to any rights that had been thereby determined. There was a very important judicial duty to be performed by the court below, in carrying that decree into effect. A partition was to be made and accounts stated. A certain interest in the coal under these lands had been adjudged to the appellant, which was to be laid off to him by surface measurement, in severalty, or by separate alternate enjoyments of the whole for limited periods, or by a division with compensation for equality; or by some other mode that would effect justice among the parties, in view of the peculiar and complicated nature of the property, and its condition, as to rights, modes of enjoyment, convenience, accessibility, and the conflicting causes of other persons. 1 *Story Eq.*, 656, *a. b.* These and the accounts, were matters to be settled according to the rules of equity; but in subordination to the law of the case, and the rights of the parties as established by the decree. It sometimes happens that collateral proceedings are necessary to aid commissioners and other officers of the court, in the performance of their duties; and hence, in this case, the complainant and the

commissioners both suggested to the court, that difficulties had occurred in making the partition, by reason of these conveyances, and it was to enable them to adjust the equities arising out of this state of things, that they asked the advice and direction of the court.

It could not have been the design of the complainant to open new issues on questions of right, that had been decided by the Court of Appeals. His petition invited no such controversy, and admitted of no answer to that end, though it was proper for the defendants to answer it, if they chose, for the purpose of having these collateral questions brought fairly before the court. But certainly not to reduce the claims and rights of the complainant, within narrower limits than had been assigned to them by the decree. These proceedings, therefore, being proper to be considered in connection with the mode of making partition, and not to limit the "rights, interests and privileges" of the complainant, as established by the decree, we proceed to express our views of this part of the case. We are reminded by the counsel for the appellees, that "in cases of partition, a court of equity founds itself on its general jurisdiction; and administers its relief, *ex æquo et bono*, according to its own notions of general justice and equity between parties," (1 *Story's Equity*, 656, *c*,) and it is insisted, that according to this principle, the appellant should be restricted to the smallest measure of relief, consistent with the principles of the former decree, in view of the extreme hardship, and probable ruin, that may result to the appellees, if his claim be allowed to its full extent. If these should be the consequences, they will flow from the agreement of the appellees with Neff, and their subsequently dealing with these lots as if their contract had not been made. It must be remembered that Young has succeeded to the rights of Neff, whatever they were, at the time of the assignment to him, (August 1843.) And we do not understand that any laches is imputed to the complainant in making known his claims under the assignment, however culpable Neff is said to have been in this respect. The deed from Neff to Young was

executed on the 22nd August 1843, and recorded 2nd October of the same year.   His bill was filed 17th February 1845, This deed was notice to the appellees, not only that Young was the owner of all the land derived from Josiah Frost, by Neff, which he, (Neff,) held on that day, but, also, that he was assignee of all his rights and claims, under the agreement of October 1828.   As the appellees were parties to that agreement, they must be treated as having had knowledge of its terms and import, and of the rights conferred by it; and that any sales or transfers of these lots, without reserving Young's interest in the coal under them, would be made in violation of his rights, as assignee.   Under any aspect of these equities, therefore, the decree would be reversed, because the court below erred in restricting him to partition of the coal remaining at the time the suit was commenced, and, as to the coal under the lots, sold by them prior to the deed to Young, it is not a sufficient answer to say, that they only designed to dispose of their own interest and estate in them; and that the purchasers, claiming under them, are not entitled to all the coal which underlies these lots.   In the first place, the deeds are not in the record to shew what estate they conveyed; and if they were, and it appeared that one-third of said coal was reserved, equity might require this third to be laid off to them in ascertaining their shares, in order to relieve the appellant from the necessity of adjusting, with Frost's grantees, the equities likely to arise under this interpretation of the conveyances.   And if, on the other hand, the lots were sold in fee-simple, and they have received what they deemed their fair value at the time, why should not the same mode of partition prevail?   This is sometimes done where portions of the land, held in common, have been sold, or otherwise exclusively appropriated by one or more of the parties, and we see no objection to the application of the same rule, in a case like the present, if the quantity of coal so appropriated, can be ascertained.   If the defendants instead of selling these lots, had opened the mines, and made expenditures for working them, and were so engaged, equity might give them a fair claim to

have this part of the coal-field assigned to them, to save their improvements and investments; and a similar arrangement would be applied in favor of the appellant, and others interested, because it might best accommodate the parties, and render their shares of most value to them, with reference to their respective situations in relation to the property before the partition. 1 *Story Eq.*, 656, *(c.)* 1 *Young and Collyer*, 538. 2 *Ditto*, 586.

These vendees cannot be molested in the enjoyment of their property, according to their titles under the deeds. They are purchasers without notice of these equities, and their title is paramount to any of these parties, who only held the coal, and not the land, in common. As to the land, they held by metes and bounds, in severalty. Each had a right to sell in fee and to pass a clear title in the coal to a *bona fide* purchaser, without notice of the equities existing between the grantor and the other parties to the agreement of October 1828. Neff might have protected himself even against these purchasers by notice of his claim, but we are not now dealing with them. The question is between the parties to the agreement. And as to the appellees, was any notice of claim from Neff necessary, when the law presumes that they knew his rights as well as he did himself; and that in selling these lots, without reserving his third of the coal or obtaining his consent, they were rendering themselves liable to the equities and modes of adjustment, which a fair partition might render necessary? A man will not be allowed to enter into an agreement and then plead his ignorance of its obligations, as an excuse for perpetrating wrong and injustice to the other party. 1 *Gill*, 29. It is not the case of a *bona fide* vendee without notice, but is like that of *Casey vs. Inloes*, 1 *Gill*, 501, 502, where, each party being equally aware of the rights of the other, notice was held to be unnecessary. Some of these deeds were executed after 1835, when they had been notified of the claim of Neff; and sales were continued, between the time of Young's purchase and the filing of his bill, and even after the filing of the bill, the appellees thus seeming

to disregard the claims of the parties, when presented in the most formal manner.

It is said, that it would not be unfair to the complainant to charge the defendants with the value of the coal under the lots sold by them at the time of the sales, because the purchase was made by Neff, as a speculation, at a time when this coal was of little or no account, and that Young, coming in under Neff, purchased a law suit, and deserves little favor at the hands of this court. The Court of Appeals, on the former appeal, said, that the complainant was not obnoxious to the charge or consequences of champerty, and this question is not now before us. It is not to be imputed to Neff, or his assignee, that he purchased an interest in these coal lands with reference to their prospective value, if no advantage is shewn to have been taken of the other parties. We know that the coal lands of Maryland have presented a field for speculators for years past, and we are not aware of any reason that should prejudice purchasers of this kind in the estimation of our courts. The same might as well be said of every purchase where the property has risen in value. This result is often the object in view, and no man would embark his means in developing such resources, if he was likely to be deprived of his property upon the discovery of new elements of wealth, unknown to the parties at the time of the transaction. But if all be true that has been said of the estimated value of these lands, when this agreement was made, the speculation scarcely possessed the merit of any consideration in exchange for the absolute and certain interests that Neff conveyed to the Frosts, and if the venture has turned out to be profitable, he or his assignee may rightfully claim the gains as a compensation for the risks. If the lands of the Frosts had remained as valueless in coal as they were then considered, the loss would have been all on Neff's side, and the appellees would have been the gainers, to the extent of two-thirds of the coal in his hands. He would have had no cause of complaint against them, and could have set up no such equity against the execution of the agreement. Considering the

nature and the character of the property, we think that compensation in money, as of the time of the sales, would not be the most equitable mode of making the partition, but that coal should be assigned to the complainant for his full share, regard being had to quality and quantity, if it can be done with reference to accessibility and the convenience in mining, of all the parties interested. This is not like the case of *Carter vs. Carter*, 5 *Munf.*, 108, relied on by the appellees' counsel. Besides the important difference in the nature of the property, and the objects of persons in entering into transactions of this kind, which would not always be gratified by compensation in money, or by assigning the coal under these lots at a given price, in that case the party, who had been in possession of the property for a long time, himself discovered the title of the others, and notified them of it, immediately after it was discovered by himself. Here the parties were not ignorant of the rights of Neff, and, more especially, not of those of Young; and with this knowledge, they continued to deal with the property as their own, and to make sales, and to convert these coal lands into corporate property, without any reservation of Young's interest, before and after the bill was filed.

The claim set up by the Frostburg Coal Company and Messrs. McKaig, may be disposed of by what has been said as to the sales of the other lots. At the time the bill was filed, theirs was but an equitable title, and posterior to that of the complainant, even if the deed from Neff were not sufficient to put them on enquiry as to the title, and to charge them with notice of Young's claims. 5 *Gill*, 483. There does not appear to have been any action on the proceedings introduced by these parties, and therefore no specific relief could be granted them on this appeal, if the facts of the case gave them a right thereto.

It is impossible for this court, in cases like the present, where so much depends on the situation of the property, and the judgment of scientific men, and of persons practically acquainted with its nature and value, to furnish specific direc-

tions as to the different alternative modes of making partition. We can but declare the rights of the parties, and leave to the court below the important duty of executing our decree, according to the best guides to be obtained.

The fourth point of the appellant does not present sufficient ground for reversing the decree. In England the decree provides, that the parties shall execute mutual conveyances, to vest the title in severalty; "but in this State, the final decree confirms the partition, and declares that each party shall hold his share in severalty, and this decree operates as a conveyance." *Md. Ch. Pr.*, 166. If, however, parties desire such conveyances, they would be provided for in the decree.

A decree will be passed, reversing and remanding the cause.

*Decree reversed and cause remanded.*